# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 3, 2013        Decided January 24, 2014

No. 12-5366

ADIRONDACK MEDICAL CENTER, ET AL.,
APPELLANTS

CORNING HOSPITAL, ET AL.,
APPELLEES

v.

KATHLEEN SEBELIUS, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01671)

———

*M. Miller Baker* argued the cause for appellants. With him on the briefs were *Ankur J. Goel* and *Johnny H. Walker.*

*Abby C. Wright*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Michael S. Raab*, Attorney.

2

Before: ROGERS and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge.* In 2007, the Secretary of Health and Human Services revamped Medicare's Inpatient Prospective Payment System, updating the diagnostic weighting used to calculate reimbursements for hospitals treating the program's beneficiaries. As with most changes to complex systems, there were unintended consequences—namely in the form of overpayments to hospitals—but Congress had proactively attempted to counter unwarranted increases by adjusting the standardized base amount used to calculate reimbursement for the majority of hospitals. The Secretary thought, however, the fiscal pain should be shared and opted to temper Congress' targeted response by mixing it with an adjustment for hospitals not affected by the congressional directive. She invoked her broad-spectrum grant of authority to ensure all hospitals—not just the ones relying on the standardized amount—would share the burden.

A number of hospitals—those serving rural and otherwise underserved communities—objected to being part of the cure. They insist Congress' legislative prescription—to adjust standardized base amounts—was the only course available to the Secretary to offset overpayment. We disagree and affirm the decision of the district court.

I

For our purposes today, the labyrinthine world of Medicare has two types of hospitals that enjoy different reimbursement schemes. The first group is reimbursed under the "federal rate"—a formula that takes a standardized base

amount (derived from national data) and multiplies it by a weight associated with a diagnosis-related group (DRG).[1] *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994); *see also* 42 U.S.C. § 1395ww(d)(3)(D). While these hospitals are certainly affected by the Secretary's actions in the case at bar, they are not the focus of this appeal.

The second group of hospitals, which includes Appellants ("the Hospitals"), follows a different formula, the "hospital-specific rate." Their reimbursement is calculated with a base amount derived not from national data, but from historic operating costs at an individual hospital. *See* 42 U.S.C. §§ 1395ww(d)(5)(D), 1395ww(d)(5)(G). That hospital-specific base is then multiplied by a DRG weight. 42 C.F.R. § 412.73(e). Because these facilities typically serve underserved communities, they have the option of receiving the higher of either the federal rate *or* the hospital-specific rate.[2]

---

[1] In somewhat more relatable parlance, a DRG is a category of inpatient treatment. Each DRG weight reflects "the relative hospital resources used with respect to discharges classified within that group compared to discharges classified within other groups." 42 U.S.C. § 1395ww(d)(4)(B).

[2] Reimbursements for "sole community hospitals" are fairly straightforward—such hospitals are paid the higher of either the federal rate or the hospital-specific rate. *See* 42 U.S.C. § 1395ww(d)(5)(D)(i). The payout for Medicare dependent hospitals, however, differs slightly—that number is calculated by taking the federal rate and adding 75% of the difference between the federal rate payment and the hospital-specific rate payment. *See id.* § 1395ww(d)(5)(G)(ii)(II).

Congress eventually directed the Secretary of Health and Human Services to "adjust the classifications and weighting factors" associated with the DRGs "to reflect changes in treatment patterns, technology, . . . and other factors which may change the relative use of hospital resources." 42 U.S.C. § 1395ww(d)(4)(C)(i). But despite longstanding general authority to "provide by regulation for such other exceptions and adjustments to . . . payment amounts," *see, e.g.*, 42 U.S.C. § 1395ww(d)(5)(C)(iii) (1982), the agency demurred because it was unsure how to address the effects of such adjustments. *See* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1996 Rates, 60 Fed. Reg. 29,202, 29,247 (June 2, 1995). In response, Congress enacted 42 U.S.C. § 1395ww(d)(3)(A)(vi), which reads:

> Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) for a previous fiscal year (or estimates that such adjustments for a future fiscal year) did (or are likely to) result in a change in aggregate payments under this subsection during the fiscal year that are a result of changes in the coding or classification of discharges that do not reflect real changes in case mix, the Secretary may adjust the average standardized amounts computed under this paragraph for subsequent fiscal years so as to eliminate the effect of such coding or classification changes.

Armed with this new provision, the Secretary announced changes to the DRGs in 2007. *See, e.g.*, Changes to the Hospital Outpatient Prospective Payment System and CY 2008 Payment Rates, 72 Fed. Reg. 66,580, 66,886 (Nov. 27, 2007). To combat the possibility of overpayments under the new system, the Secretary adjusted the standardized amount downward by 1.2% and 1.8% for fiscal years 2008 and 2009, respectively. *See* Changes to the Hospital Inpatient

Prospective Payment Systems and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130, 47,186 (Aug. 22, 2007). But Congress intervened, halving the amount of adjustment by enacting the Transitional Medical Assistance, Abstinence Education, and QI Programs Extension Act of 2007, Pub. L. No. 110-90, § 7(a), 121 Stat. 984, 984 (2007) ("TMA"). A greater adjustment would require a determination by the Secretary that the "changes in coding and classification . . . did not reflect real changes in case mix" prior to making prospective adjustments under § 1395ww(d)(3)(A)(vi) and recoupment adjustments under section 7(b)(1)(B) of the TMA.

The Secretary accordingly conducted retrospective analyses and proposed a downward prospective adjustment for hospital-specific rate payments. Citing a need to "avoid what could be widespread, disruptive effects of . . . adjustments on hospitals" that would occur by only adjusting the standardized amounts, the Secretary opted to temper the impact of reclassification by splitting the difference between "federal rate" and "hospital-specific rate" hospitals. Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System Changes and FY2011 Rates, 75 Fed. Reg. 50,042, 50,070 (Aug. 16, 2010). The latter group objected, asserting the Secretary's action would "endanger their ability to provide the type of care that Congress specifically sought to protect by establishing their special Medicare payment systems." *Id.* Relying on the once-obscure grant of authority in § 1395ww(d)(5)(I)(i), the Secretary implemented the adjustments anyway. *See id.*

The Hospitals sought expedited judicial review of the Secretary's decision from the Provider Reimbursement Review Board, which disclaimed jurisdiction but noted it would have otherwise expedited review. Once the Medicare

6

administrator reversed the Board's jurisdictional finding, the Hospitals filed suit in district court, claiming the Secretary's decision was arbitrary, capricious, and exceeded the scope of her statutory authority. The Secretary responded by filing a motion to dismiss. Finding the statutory scheme ambiguous and deferring to the Secretary's reasonable interpretation of the adjustment provisions, the district court granted the motion. *See Adirondack Med. Ctr. v. Sebelius*, 891 F. Supp. 2d 36, 48 (D.D.C. 2012).

## II

This case rests on *Chevron* deference. We review a district court's deference decision *de novo*, "employing traditional tools of statutory construction." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (internal quotation marks omitted). The first step of this familiar inquiry is considering "the text, structure, purpose, and history of an agency's authorizing statute" to determine whether a provision reveals congressional intent about the precise question at issue. *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 503 (D.C. Cir. 2013) (internal quotation marks omitted). If we cannot readily divine Congress' clear intent, we must defer to the agency's interpretation of the statute so long as it is "based on a permissible construction of the statute." *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984).

## A

The Hospitals begin their *Chevron* challenge relying on the canon of *expressio unius est exclusio alterius* (the expression of one is the exclusion of others). In their reply brief, the Hospitals assert they "invoke *expressio unius* only

to establish that subsection (d)(3)(A)(vi) *on its own terms* unambiguously authorizes adjustments solely to the standardized amount." Reply Br. at 6 n.3. Had the Secretary attempted to promulgate the changes to the hospital-specific rates by invoking § 1395ww(d)(3)(A)(vi), the canon would have force in isolation. But the Secretary did no such thing.

Instead, the manner in which the Appellants rely on the *expressio unius* canon suggests they are drawing on the canon's *preclusive* power. In other words, the very invocation of the canon constitutes a challenge to the Secretary's broad authority. The nature of their argument is in the very name of the canon—*exclusio alterius*, or the exclusion of the other. As § 1395ww(d)(3)(A)(vi) concerns the grant of authority, the invocation of the canon must naturally involve an attempt to exclude all other potential sources of authority when it comes to remedying a particular malady. And when one possible interpretation of a statutory provision has the potential to render another provision inert, we cannot simply say, as the Appellants suggest we do, that we are reviewing the former in isolation. Rather, the canon's relevance and applicability must be assessed within the context of the entire statutory framework. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 267 (D.C. Cir. 2001) ("[W]e must not 'confine [ourselves] to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000))).

With that in mind, we turn to the Hospitals' argument. They read the grant of authority in § 1395ww(d)(3)(A)(vi) as impliedly precluding the Secretary from modifying hospital-specific rates to offset increased payments resulting from the 2008 and 2009 coding practice changes. It is clear, they say,

Congress intended to shield such rates from modification by directing the Secretary to adjust *only* the standardized amounts in an effort to compensate for the deleterious or unwanted effects of such changes.

This may be a reasonable reading of the statute, but our inquiry at *Chevron* step one is not satisfied by reasonableness alone. *See Chevron*, 467 U.S. at 842–43. The *expressio unius* canon is a "feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Cheney R.R. Co. v. I.C.C.*, 902 F.2d 66, 68–69 (D.C. Cir. 1990) (citing *Chevron*, 467 U.S. at 843–44). It offers "too thin a reed to support the conclusion that Congress has clearly resolved an issue." *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1405 (D.C. Cir. 1996) (quoting *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991) (internal brackets and quotation mark omitted). And when countervailed by a broad grant of authority contained within the same statutory scheme, the canon is a poor indicator of Congress' intent. *See Creekstone Farms Premium Beef, L.L.C. v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008); *see also Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1014 (D.C. Cir. 1999) ("Under *Chevron* step one we consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part." (quoting *Ill. Pub. Telecomms. Ass'n v. FCC*, 117 F.3d 555, 568 (D.C. Cir. 1997) (internal quotation marks omitted))).

Even if the canon has some force here, nothing unambiguously suggests Congress intended to strip the Secretary of her broad grant of authority under § 1395ww(d)(5)(I)(i). Consider, for example, the language of § 1395ww(d)(3)(A)(vi): "the Secretary *may* adjust the

average standardized amounts." The Hospitals understand this to mean the Secretary may *only* adjust the standardized amounts. *See* Reply Br. at 3. Momentarily setting aside our understanding that Congress generally knows how to use the word "only" when drafting laws, *see Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 817 (D.C. Cir. 2008), it seems more likely that § 1395ww(d)(3)(A)(vi) was Congress' attempt "to clarify what might be doubtful." *See Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998).

Prior to the enactment of § 1395ww(d)(3)(A)(vi), the Department expressed doubts about its ability to correct the potential for anomalously-high payments resulting from changes to how hospital cases were classified. *See* Changes to the Hospital Inpatient Prospective Payment Systems, 66 Fed. Reg. 39,828, 39,862 (Aug. 1, 2001) ("We have stated that, prior to implementing severity-adjusted DRGs, we would need specific legislative authority to offset any significant anticipated increase in payments attributable to changes in coding practices caused by significant changes to the DRG classification system."). Congress responded by enacting § 1395ww(d)(3)(A)(vi). *See* Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, app. F, tit. III, § 301(e)(1), 114 Stat. 2763, 2763A493; *see also* Changes to the Hospital Inpatient Prospective Payment Systems, 66 Fed. Reg. at 39,862. This sequence of events gives support to the idea that Congress intended to clarify and complement the Secretary's existing authority—i.e., to "make assurance double sure," *see Shook*, 132 F.3d at 782 (internal quotation marks omitted)—not to extinguish or eliminate it. Confronted by two plausible readings of the statute, we cannot declare Congress' intent unambiguous. *See Am. Petroleum Inst. v. U.S. EPA*, 906 F.2d 729, 740 (D.C. Cir. 1990) (per curiam).

Section 7(b)(1) of the TMA gives us little pause. As the Hospitals point out, the provision employs more forceful language than what we see in § 1395ww(d)(3)(A)(vi): "the Secretary *shall . . .* make an appropriate adjustment." In their view, the use of such mandatory language—paired with the *non obstante* clause prefacing it—demonstrates Congress' unambiguous intent to direct the Secretary to adjust only the standardized amount. These textual aids, however, do not sufficiently dispel the provision's ambiguity. We cannot say the use of the word "shall" makes much of a difference, for the broad grant of authority enshrined in § 1395ww(d)(5)(I)(i) also employs the same word. As with § 1395ww(d)(3)(A)(vi), we are thus left with two equally plausible explanations: (1) a conflictive one, rendering the provisions mutually exclusive congressional directives; and (2) a harmonious one, reading the statutory authorizations as overlapping. The dizzying array of other canons that could shift the analysis one way or another—e.g., the treatment of the *non obstante* clause, *see Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993), or the presumption against implied repeals, *see Branch v. Smith*, 538 U.S. 254, 273 (2003), militates against finding unambiguous congressional intent here.

B

The hospitals next turn to the "basic principle of statutory construction that a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned." *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (citing *Bulova Watch Co. v. United States*, 365 U.S. 753, 761 (1961)). The canon is impotent, however, unless the compared statutes are "irreconcilably conflicting." *See Detweiler v. Pena*, 38 F.3d 591, 596 (D.C. Cir. 1994) (citing *Watt v. Alaska*, 451 U.S. 259, 266 (1981)). Absent

clearly expressed congressional intent to the contrary, it is our duty to harmonize the provisions and render each effective. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974).

As explained above, § 1395ww(d)(3)(A)(vi) and section 7(b)(1) of the TMA can be reasonably construed as grants of authority that complement and overlap with § 1395ww(d)(5)(I)(i). Put differently, it is not unreasonable to say § 1395ww(d)(5)(I)(i) operates to the extent that § 1395ww(d)(3)(A)(vi) and section 7(b)(1) of the TMA are silent. The two provisions say nothing about adjusting the hospital-specific rate; therefore, the broad grant of authority (and the Secretary's use thereof) fills a space that the specific provisions do not occupy. Such an arrangement does not run afoul of the general/specific canon. *See United States v. Chase*, 135 U.S. 255, 260 (1890) ("It is an old and familiar rule that where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." (citations and internal quotation marks omitted)).

Perhaps the Hospitals' argument is better characterized as one concerning superfluity. *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) ("It is a familiar canon of statutory construction that, 'if possible,' we are to construe a statute so as to give effect to 'every clause and word.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))). Their reliance on the Supreme Court's decision in *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065 (2012), confirms this. *See id.* at 2071 ("[T]he canon has full application . . . [when] a general authorization and a

more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of the statute.'" (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) (alteration in original))). If § 1395ww(d)(5)(I)(i)'s prescription of authority is as broad as the Secretary says it is, they argue, parts of the statutory scheme will become meaningless excess and congressional directives will either be ignored or fulfilled by unintended means.

The surplusage canon is neither inviolable nor insurmountable. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). This is particularly true when agency authority is at stake. *See DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013) ("That there is overlap among the various enforcement provisions is not surprising. . . . Congress could reasonably hand the agencies a palette sufficiently sophisticated to capture the full spectrum of enforcement possibility." (citing *RadLAX*, 132 S. Ct. at 2072)).

The canon is particularly unhelpful when both interpretive outcomes lead to some sort of surplusage—either § 1395ww(d)(3)(vi)(A) and section 7(b)(1) of the TMA must give way to the broad grant of authority in § 1395ww(d)(5)(I)(i), or the last must be declared a nullity. While it is possible to give the first two provisions full effect without gutting § 1395ww(d)(5)(I)(i) in its entirety, we would need to engage in a statutory rewrite to do so—e.g., insert the word "only" here and there, insert a limiting clause to the Secretary's otherwise broad grant of authority, etc. This is not our role, *see Pub. Citizen*, 533 F.3d at 816–17 (declining to "add[] words that are not in the statute that the legislature

enacted" (citing *United States v. Monsanto*, 491 U.S. 600, 611 (1989))), and we note the need for such manipulation creates strong doubts about whether the Hospitals' interpretation is correct, let alone unambiguously clear.

We cannot divine the precise reasons for the manner of Congress' enactments. Perhaps, to build on the Bard's turn of phrase, the legislature sought "to make assurance *triple* sure." Despite the potential for statutory redundancy, Congress may have decided to clarify—not once, but twice—what the Secretary was permitted to do, thereby handing her "a palette sufficiently sophisticated to capture the full spectrum of . . . possibility." *See DeNaples*, 706 F.3d at 487. At the very least, we remain unconvinced the statutory scheme is unambiguous in evincing Congress' intent.

C

Finally, the Hospitals point to the American Taxpayer Relief Act of 2012, which states "the Secretary of Health and Human Services shall not have authority to fully recoup past overpayments related to documentation and coding changes from fiscal years 2008 and 2009." Pub. L. No. 112-240, § 631(a)(2), 126 Stat. 2313, 2353 (2013). Acknowledging that their argument with respect to the Act is legally futile, the Hospitals instead cite it in an appeal to sound policy and judicial prudence. It would make "little sense," they argue, for Congress to constrain the Secretary's authority with respect to recoupment adjustments, while leaving untouched her authority to make prospective adjustments. *See* Reply Br. at 17–18.

We need not dwell on this point too long, as "[s]uch policy arguments are more properly addressed to legislators or administrators, not to judges." *See Chevron*, 467 U.S. at 864.

And in any event, the Secretary offers a plausible explanation: as there was nothing left to recoup with respect to FY 2008 and FY 2009, Congress decided to close that particular tap. *See* Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Fiscal Year 2013 Rates, 77 Fed. Reg. 53,258, 53,276 (Aug. 31, 2012) ("Because these adjustments, in effect, balanced out, there was no year-to-year change in the standardized amount due to this recoupment adjustment for FY 2012. . . . [A]ll overpayments made in FY 2008 and FY 2009 have been fully recaptured with appropriate interest, and the standardized amount has been returned to the appropriate baseline.").

D

The only certainty that we can discern from the statutory scheme is that it is unclear. We must therefore turn to step two of the *Chevron* inquiry: the reasonableness of the Secretary's interpretation. The Secretary determined there was an artificial increase unrelated to any actual change in the severity of illnesses treated. She therefore made a downward adjustment to the rate paid to rural and sole community hospitals in order to ameliorate the increasing rate paid to all hospitals due to the revamping of the diagnosis coding system. In so doing, the Secretary reasonably exercised her authority under § 1395ww(d)(5)(I)(i) to provide "for such other exceptions and adjustments to [IPPS] payment amounts . . . as the Secretary deems appropriate."

This case ultimately concerns the Secretary's ability to combat *artificial* increases in payment amounts, i.e., to minimize the hospitals' receipt of funds for expenses they have not incurred. *See* Changes to the Hospital Outpatient Prospective Payment System and CY 2008 Payment Rates, 72

Fed. Reg. at 47,178. In attempting to preserve this financial windfall, the Appellants argue for a statutory interpretation that severely cabins the Secretary's ability to rectify a difficult and legitimate problem. We do not think this is a reasonable approach, particularly as the Appellants' gain comes at every other participating hospital's loss. However much Congress sought to protect hospitals serving underserved communities—hospitals that are already protected under special formulae—we cannot say such a cumulative benefit was unquestionably intended by the legislature.

## III

The Hospitals contend our inquiry ends at the first *Chevron* step. Our analysis suggests otherwise. We agree with the district court's conclusion that the statutory scheme was ambiguous and unclear. Its decision, therefore, is

*Affirmed.*